[Cite as *State v. Banto*, 2026-Ohio-2489.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

    v.

JEREMIAH Q. BANTO

    Appellant

C.A. No.     2025CA0029-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     2024CR0748

DECISION AND JOURNAL ENTRY

Dated: June 30, 2026

STEVENSON, Judge.

**{¶1}** Defendant-Appellant Jeremiah Banto appeals from the judgment of the Medina County Common Pleas Court that found him guilty of aggravated arson and grand theft of a vehicle. This Court affirms.

I.

**{¶2}** The jury heard the following testimony. On November 4, 2024, Mr. Banto walked into the Central Auto Group ("Central Auto") in Medina and asked to test drive a 2017 Audi A4. Mr. Milan Milenkovic, a representative of Central Auto, obtained Mr. Banto's driver's license and signature on a test-drive agreement. About an hour later, Mr. Milenkovic called the police to report the Audi stolen as Mr. Banto had not returned it. Mr. Milenkovic had not given Mr. Banto permission to take the Audi and not return it without paying for it, and Mr. Banto did not pay for the vehicle. Mr. Milenkovic called and texted Mr. Banto. Mr. Banto responded that his truck was parked at Walmart and Mr. Milenkovic could pick it up and take it in exchange for the Audi. Mr.

Milenkovic told Mr. Banto that he did not need Mr. Banto's vehicle and just wanted the Audi back. Mr. Banto told Mr. Milenkovic that he would return the Audi in a couple months. Mr. Milenkovic learned from the police later that evening that the Audi had been recovered in the state of New York.

{¶3} On the day in question, Mr. Patrick Barret, a Fire Medic with the Strongsville Fire department, was in line at the Medina Walmart waiting to pay for his purchase when he noticed a man in a silver jacket walking behind him and talking to himself before proceeding down an aisle. Shortly thereafter, a man later identified as Isaiah Elting yelled for a fire extinguisher and Mr. Barret noticed smoke from a fire rising from the aisle that the man in the silver jacket had walked down. Mr. Barret and Mr. Elting both grabbed fire extinguishers and put the fire out. No one else was in the aisle when they arrived there. Mr. Barret saw that fire starter logs were smoldering, shelving and plastic was on fire, and there was a propane canister in the aisle. While Mr. Barret was spraying the fire, Mr. Elting took boxes off the shelves, spread them out in the aisle, and started spraying them. Both men took the larger items, such as heat lamps with kerosene, outside the store. They both said that the smoke from the fire filled the building up to the ceiling level and crept across the store.

{¶4} Mr. Barret spoke to the police when they arrived. Upon viewing the video footage from the security cameras, he saw a man wearing a silver jacket entering the aisle where the fire occurred and recognized him as the same man he saw earlier walking behind him and into the aisle. He also saw the same man in a photograph that depicted the man at the Walmart exit. Mr. Barret identified Mr. Banto in open court as the man in the video and the photograph.

{¶5} Mark Cassidy, an investigator with the State Fire Marshal's Office, was called to investigate the fire. He testified that he reviewed the security videos, documented the scene, took

photos, and spoke to Mr. Barret and Mr. Elting. Based on the burn patterns that he observed on the shelving, he determined that the origin of the fire was the fire starter logs and that it looked like two fires had been set in the same aisle. Upon viewing the video, he did not see any other individuals walk down the aisle besides Mr. Banto. Mr. Cassidy's testimony was that the video showed smoke appearing within one minute of Mr. Banto walking down the aisle. He identified Mr. Banto in court as the same man on the video. He concluded that Mr. Banto had used an external flame source to ignite combustible products and that the fire was "[i]ncendiary," meaning that it had been "intentionally set[.]" He arrived at that conclusion because there were no bare wires or any other objects found that could have spontaneously started the fire. He further testified that the situation was very dangerous to anyone in the store because "smoke kills, not fire."

{¶6} David Steidl, the Medina Walmart Asset Protection Investigator, testified that he responded to an internal security alarm that went off indicating that there was a fire in the automotive aisle and immediately noticed a lot of smoke near the ceiling. He assisted Mr. Elting and Mr. Barret with moving kerosene heaters and fire log boxes outside and helped evacuate shoppers from the store. He said the security video footage showed Mr. Banto's entire path through the store from the time he entered until he exited but did not show the inside of the aisle where the fire started. He turned the video footage over to law enforcement.

{¶7} Mathew Adamini, the Medina Walmart Asset Protection Manager, testified that the dollar value of the loss to Walmart inventory was approximately $170,000. He viewed the video footage and determined that only one man went down the aisle right before the fire, and the same man was the only person seen exiting the aisle when the smoke became visible. He identified a photograph of a man with a silver jacket exiting Walmart and said he was the same man in the

video that went down the aisle where the fire started. Mr. Adamini identified Mr. Banto in open court as the man in the photograph and video.

{¶8} Detective Michael Oyler of the Medina Township Police Department testified that upon responding to the scene he met with the police chief and Mr. Steidl. He viewed the security video and determined that the man wearing a silver jacket was the only person in the vicinity of the fire before the fire started. Detective Oyler identified Mr. Banto in open court as the man in the silver jacket that he saw in the security video. He further testified that the video footage showed Mr. Banto walking out of the store, through the Walmart parking lot, and getting back into the Audi at the far end of the lot. He said the Audi was shown turning right out of the Walmart parking lot. During his investigation, Detective Oyler was able to zoom in on the license plate. He learned from dispatch that Central Auto was the registered owner. Detective Oyler and his police chief went to Central Auto and spoke with Mr. Milenkovic who had already made a police report. Later in the afternoon, Detective Oyler received a call from the New York State Police informing him that they had found the Audi. Detective Oyler drove to New York the next day to bring Mr. Banto back to Medina County. Mr. Banto explained to Detective Oyler that his truck had broken down and was towed to the Medina Walmart store and he needed a vehicle to get home to his children in Rhode Island.

{¶9} In November 2024, Mr. Banto was indicted by the grand jury on one count of aggravated arson in violation of R.C. 2909.02(A)(1), 2909.02(B)(2), a felony of the first degree, and one count of grand theft of a motor vehicle in violation of R.C. 2913.02(A)(1), 2913.02(B)(5), a felony of the fourth degree. Mr. Banto pleaded not guilty and bond conditions were established. Mr. Banto entered a plea of not guilty by reason of insanity and requested a competency evaluation. The trial court referred him to the Akron Psycho-Diagnostic Clinic for that evaluation. In January

2025 the trial court held a competency hearing. Based on the report from the Akron Psycho-Diagnostic Clinic, the court determined that Mr. Banto was competent to stand trial. Both the State and Mr. Banto stipulated to the authenticity, admissibility, and contents of the report.

{¶10} The matter proceeded to a jury trial in April 2025. The State presented eight witnesses and its exhibits were all admitted into evidence. Mr. Banto did not call any witnesses or testify in his defense at trial. The jury found Mr. Banto guilty on both counts and he was sentenced. Mr. Banto timely appealed and sets forth three assignments of error for our review.

II.

## ASSIGNMENT OF ERROR I

**THE TRIAL COURT ERRED IN DENYING [MR. BANTO'S] MOTIONS FOR ACQUITTAL AS THE EVIDENCE WAS INSUFFICIENT TO SUPPORT CONVICTIONS FOR AGGRAVATED ARSON AND GRAND THEFT OF A MOTOR VEHICLE, AND THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]**

{¶11} Mr. Banto argues in this assignment of error that his convictions are against both the sufficiency and manifest weight of the evidence. In presenting those arguments, Mr. Banto has not separately argued sufficiency and manifest weight. This Court has recently stated the following on this subject:

> [S]ufficiency and manifest weight are separate and distinct questions, and this Court has repeatedly noted that it is not appropriate to combine sufficiency and manifest weight arguments within a single discussion. *See also* App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to . . . argue the assignment separately in the brief[.]") . . . Moreover, these concepts differ both qualitatively and quantitatively.

(Internal quotations and citations omitted.) *State v. Mingo*, 2024-Ohio-543, ¶ 28 (9th Dist.). "To aid the administration of justice, however, we choose to exercise our discretion and will separately consider [Mr. Banto's] combined arguments." *Id.*

{¶12} Crim.R. 29(A) provides that "[t]he court on motion of a defendant . . . shall order the entry of a judgment of acquittal of one or more offenses charged . . . if the evidence is insufficient to sustain a conviction . . . ." "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37. "There is no difference between the standard of review for a challenge to the sufficiency of the evidence and that for a motion for acquittal under Crim R. 29." *State v. Rivera*, 2023-Ohio-1788, ¶ 37 (9th Dist.).

{¶13} Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). A sufficiency review does not "resolve evidentiary conflicts or assess the credibility of witnesses . . . ." *State v. Hall*, 2017-Ohio-73, ¶ 10 (9th Dist.). "A challenge to the sufficiency of the evidence concerns the State's burden of production and is, in essence, a test of adequacy." *State v. Wilk*, 2023-Ohio-112, ¶ 9 (9th Dist.), citing *In re R.H.*, 2017-Ohio-7852, ¶ 25 (9th Dist.); *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶14} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.). "This Court

will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 2016-Ohio-443, ¶ 29 (9th Dist.).

## AGGRAVATED ARSON

{¶15} R.C. 2909.02(A)(1) prohibits aggravated arson and provides that: "[n]o person, by means of fire or explosion, shall knowingly do any of the following: (1) [c]reate a substantial risk of serious physical harm to any person other than the offender[.]" Mr. Banto argues that the State failed to prove beyond a reasonable doubt his intent to knowingly create a substantial risk of serious physical harm to people in Walmart. He argues that the evidence against him was largely circumstantial, based primarily on a security video showing him going into the aisle where a fire started, combustible materials were located, and smoke was observed, but that there was no direct evidence presented showing that he actually set the fire and no ignition device was recovered in his possession. Mr. Banto acknowledges that circumstantial and direct evidence possess the same probative value and are indistinguishable insofar as the jury's fact-finding function is concerned. *See Jenks,* 62 Ohio St.3d at paragraph one of the syllabus. He further acknowledges that this is particularly true in arson cases where out of necessity proof relies heavily on circumstantial evidence. *State v. Weber,* 124 Ohio App.3d 451, 462 (9th Dist. 1997), citing *State v. Pruiett*, 1987 WL 9839, *1 (9th Dist. Apr. 15, 1987). However, he argues that the circumstantial evidence here is insufficient to establish his connection to the ignition of the fire.

{¶16} He also argues that there was insufficient evidence of a substantial risk of serious physical harm to anyone because the fire was quickly extinguished by two civilians; the sprinkler system did not engage thus indicating that the fire did not reach a dangerous temperature; no

witness testified that anyone was placed at substantial risk of harm; and damage to property does not satisfy this element.

{¶17} Regarding manifest weight, Mr. Banto merely reiterates his sufficiency arguments, stating that "[t]he circumstantial nature of the evidence against [him] . . . combined with the lack of direct evidence showing him setting the fire and the absence of any recovered ignition device, creates reasonable doubt as to his guilt." He maintains that "[t]his is precisely the type of exceptional case where the evidence weighs heavily against conviction, warranting reversal."

{¶18} At trial, Mr. Barret witnessed Mr. Banto walk down the aisle right before the fire and no one was in the aisle when he and Mr. Elting extinguished the fire. As outlined above, several witnesses testified that the security video showed that Mr. Banto was the only one who entered the aisle immediately before the fire, and the only one who exited the aisle one minute later after the smoke started to rise. From that testimony and evidence, the reasonable inference is that Mr. Banto set the fire. Mr. Banto did not propose any other theory or explanation of his innocence such as seeing someone else in the aisle who could have been a suspect or that he witnessed someone else light the fire. Mr. Banto did not appear in the video as being in a state of alarm or fear, which would be expected from someone who saw fire in a store, nor did he alert anyone that there was a fire. From this evidence, a rational trier of fact could have found that Mr. Banto started the fire.

{¶19} R.C. 2901.01(A)(8) defines "[s]ubstantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur . . . ." At trial, the State's case relied on the definition of "serious physical harm" set forth in R.C. 2901.01(A)(5)(b) ("carries a substantial risk of death") and (c) ("involves some permanent incapacity"). Even though Mr. Barret and Mr. Elting quickly extinguished the fire and the

sprinkler system did not engage, the testimony and evidence showed that the aisle where the fire started contained starter logs, candlestick lighters, and propane tanks, all of which are highly combustible. The potential risk of harm posed by those items catching fire is one of the reasons why Walmart security and the police called in the State Fire Marshal to further investigate in case the suspect was a serial arsonist who may potentially subject others to serious harm by repeating these actions. Mr. Barret and Mr. Steidl testified that thick smoke permeated the store. Detective Cassidy from the State Fire Marshal's office testified that "smoke kills, not fire." In response to the Prosecutor's question whether it was a dangerous situation for the shoppers, Detective Cassidy responded "[v]ery, yes. [t]his was a dangerous situation." Walmart security evacuated the whole store to prevent smoke inhalation. Therefore, there was sufficient evidence of a "substantial risk of serious physical harm." R.C. 2909.02(A)(1); *accord State v. Pfeiffer*, 2015-Ohio-4312, ¶ 4, 51 (3d Dist.) (defendant's challenge to the sufficiency of the evidence overruled where a Walmart store had to be evacuated due to the smoke resulting from the fire that posed a substantial risk of serious physical harm*, i.e.,* carbon monoxide poisoning and smoke inhalation).

{¶20} Based on the foregoing, we conclude that the evidence was sufficient to support Mr. Banto's conviction for aggravated arson beyond a reasonable doubt. Furthermore, Mr. Banto has not shown that this is the exceptional case where the evidence weighs heavily against his conviction. *See Pfeiffer* at ¶ 59 (defendant's challenge to the manifest weight of the evidence also overruled due to the severe dangers posed by the fire).

### GRAND THEFT OF A MOTOR VEHICLE

R.C. 2913.02 prohibits grand theft and provides in relevant part that:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent[.]

. . .

(B)(5) If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree.

R.C. 2913.01(C) defines "Deprive" as any of the following:

(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;

(2) Dispose of property so as to make it unlikely that the owner will recover it;

(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.

{¶21} Mr. Banto does not contest that Central Auto is the "owner" of the Audi for purposes of R.C. 2913.02. Mr. Banto argues that the State failed to present sufficient evidence to establish precisely when Central Auto's consent to use the Audi terminated because the test-drive form did not indicate a time when it had to be returned. He points out that this line on the consent form was left blank. He further states that the fact that the Audi was later recovered abandoned in New York then returned to Central Auto several hours later shows that he did not intend to permanently deprive Central Auto of the vehicle. Specifically, he maintains that "[a]bandonment of the vehicle in a recoverable location is inconsistent with the statutory definition of 'deprive,' which includes disposing of property 'so as to make it unlikely that the owner will recover it.'"

{¶22} In support of his argument that his conviction is against the manifest weight of the evidence, he argues that the signed test drive agreement with no return time creates reasonable doubt as to whether he intended to permanently deprive Central Auto of the Audi. Therefore, he once again advances the same reason when challenging the manifest weight of the evidence as he did when challenging the sufficiency of the evidence.

{¶23} Mr. Milenkovic testified that the test-drive form is blank and no return time is filled in because it is commonly understood that a test-drive is intended to last only a few minutes and no stated return deadline is necessary. He said he has never filled that line in. He also pointed out that most dealerships do not require such a form, but instead, simply allow the customer to present a driver's license and take the vehicle for a short ride. When questioned after he took the Audi, Mr. Banto declared to both Mr. Milenkovic and Detective Oyler his intentions to take the Audi out of state for several months without offering to pay for it, thus making it unlikely that Central Auto would be able to recover it, and appropriating it without giving proper consideration. Mr. Milenkovic did not give Mr. Banto permission to drive to Rhode Island by allowing him to test drive the vehicle. The Audi was recovered because Mr. Banto ran out of gas in New York then was apprehended by the police, not because he voluntarily returned it. By Mr. Banto taking the Audi without permission, without paying for it, and with the intention of keeping it for at least several months, there was sufficient evidence to support his conviction for grand theft of a motor vehicle. Nor has Mr. Banto shown that this is the exceptional case where the evidence weighs heavily against his conviction and is against the manifest weight of the evidence.

{¶24} Mr. Banto's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT ERRED IN ADMITTING SURVEILLANCE VIDEO EVIDENCE THAT WAS MANIPULATED THROUGH PROPRIETARY SOFTWARE, VIOLATING OHIO RULES OF EVIDENCE 901 AND 1001[.]**

{¶25} During trial, after Mr. Adamini's testimony, there was a lengthy discussion between counsel and the court about the format and presentation of the Walmart security video footage. Mr. Adamini testified that with Walmart's proprietary software, the videos are shown with a fisheye lens in a 360-degree format that can be turned at different angles to get different views of

the same footage. That was the manner in which the State showed the videos during its case, stopping the footage at particular places and zooming in at different angles as the prosecutor posed questions to the witnesses. Without the Walmart software, the default view is a 360-degree flat-screen panoramic view that shows the entire camera view all at once. In response to defense counsel's concern that the jury, and potentially this Court, would not be able to replicate the exact angles that were zoomed in and controlled by the State at trial, the court allowed the State to recall Mr. Steidl to the stand to authenticate the flat-screen panoramic views of the video footage as well. Mr. Steidl authenticated each video segment that was offered into evidence in the panoramic view.

{¶26} The court ultimately agreed with the State that both sets of views demonstrated substantively the same thing, and that

> the time stamps - - no matter what we do, the time stamps are not going to be changed.
>
> . . .
>
> whether you see [Mr. Banto] walking down this aisle . . . from one angle or another angle, it still demonstrates that he walked down the aisle at [that time.]
>
> . . .
>
> There is nothing in the video that the State changed substantively, it's just the angle at which the camera or the video was presented. So the video is the video, and whether we look at it in a panoramic view or we look at it in an isolated view, the essential facts of what transpired inside that video doesn't change.

{¶27} During the admission of the State's exhibits, the defense again objected to the admission of the videos on the same basis. The court overruled the defense's objection.

{¶28} Mr. Banto argues that the trial court abused its discretion by admitting surveillance videos that were manipulated by the State to selectively present certain camera angles in violation of the authentication requirement of Evid.R. 901(A), which prohibits the alteration of evidence. Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition

precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Mr. Banto argues that the State presented "a curated version of the evidence that may have emphasized aspects favorable to the State while minimizing aspects favorable to the defense." He alleges he was prejudiced by the State's controlled presentation and the court's efforts to cure that prejudice by admitting the panoramic views were insufficient because the jury's initial impressions of the videos likely influenced its subsequent viewing. Mr. Banto does not challenge the admissibility or authenticity of the panoramic views authenticated by Mr. Steidl.

{¶29} "This Court will not reverse a trial court's admission of a photograph or video absent an abuse of discretion." *State v. Miller*, 2012-Ohio-1263, ¶ 35 (9th Dist.). A court abuses its discretion when its attitude is "unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶30} Mr. Banto alleges that the State's controlled presentation of the evidence using the Walmart software "could have" or "may have" influenced the jury's perception of the evidence and "created a risk of unfair prejudice that likely affected the outcome of the trial." This terminology indicates that his argument is merely speculative as to whether the videos actually prejudiced him. Mr. Banto has not shown that these videos do not portray what the proponent claims. Nor has Mr. Banto provided this Court with any clips of the angles shown to the jury that revealed essential facts that the jury could not have also seen from the panoramic view and that favored the State's case. In short, Mr. Banto has not shown that the essential facts of what transpired on those videos were different from the panoramic view and that he was prejudiced by it. The State asserted at trial that "[the] same angle would be viewed if it was on panoramic,

because when it's on panoramic the entire - - the entire camera is viewed all in one go" and Mr. Banto has not proven otherwise.

{¶31} Moreover, as the State pointed out at trial, defense counsel received the same videos from Walmart in the same proprietary Walmart software and could have, upon cross-examination, manipulated them to whatever views she wanted the jury to see. Thus, defense counsel was equally capable of showing different angles that favored Mr. Banto if she had chosen to do so. However, the record does not reflect that defense counsel showed the jury any other angles that would have potentially favored Mr. Banto.

{¶32} Based on the foregoing, we disagree with Mr. Banto that the trial court abused its discretion in admitting the Walmart surveillance videos. Mr. Banto's second assignment of error is overruled.

### ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED IN FINDING [MR. BANTO] COMPETENT TO STAND TRIAL DESPITE EVIDENCE OF BIPOLAR DISORDER AND A "HIGHLY VARIABLE MENTAL STATUS" WITHOUT CONDUCTING ADDITIONAL EVALUATIONS OR MONITORING[.]**

{¶33} Here, Mr. Banto argues that the trial court's failure to conduct a further mental health evaluation or monitoring of Mr. Banto before it proceeded with the trial was an abuse of discretion. In support, Mr. Banto states that his diagnosis of bipolar disorder together with his "highly variable mental status" creates sufficient indicia of incompetency that directly impacts his ability to understand the proceedings and assist in his defense. Mr. Banto emphasizes that R.C. 2945.371(A) states that a "court may order one or more evaluations[,]" indicating the legislature's recognition that multiple evaluations may be necessary in appropriate cases.

{¶34} We review a trial court's competency determination for an abuse of discretion. *State v. Stutzman*, 2021-Ohio-995, ¶ 7 (9th Dist.). We incorporate the definition of abuse of

discretion utilized above. Based on the report from the Akron Psycho-Diagnostic clinic, the court found that Mr. Banto understood the nature of the proceedings against him, could assist with his defense, and was competent to stand trial. Mr. Banto stipulated to the authenticity, admissibility, and contents of the report and did not raise the issue of competency or request a further evaluation during the competency hearing or at any other time during the trial. Therefore, as Mr. Banto did not bring this issue to the trial court's attention when he had the opportunity to do so, he is limited to a plain error argument on appeal. *State v. Samamra*, 2025-Ohio-126, ¶ 55 (9th Dist.). However, Mr. Banto has not argued plain error, and we will not develop a plain error argument on his behalf. *Id*. Even if he had properly preserved the issue, the report indicated that Mr. Banto's "highly variable mental status" was due to the fact that he was not taking any medication for his bipolar disorder at that time, but that the doctor who evaluated him intended to address that soon. Thus, Mr. Banto's "highly variable mental status" was already the subject of further evaluation and monitoring.

{¶35} Based on the foregoing, the trial court did not abuse its discretion by not ordering a further evaluation of Mr. Banto's mental health before proceeding with the trial. Mr. Banto's third assignment of error is overruled.

III.

{¶36} Accordingly, based on the foregoing, Mr. Banto's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

SCOT STEVENSON
FOR THE COURT

 

SUTTON, J.
CONCURS.

FLAGG LANZINGER, P. J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

YU MI KIM-REYNOLDS, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and STEFANIE H. ZARANEC, Assistant Prosecuting Attorney, for Appellee.